Is GSE Consulting, Inc. v. L3Harris Technologies, Inc. Just a moment for all the desks to settle before we start up again. All righty, Mr. Stovash, whenever you're ready, we will proceed. Good morning, and may it please the Court. Bob Stovash on behalf of GSE Consulting. The president of that company is actually in the courtroom today. Your Honor, this case presents a matter of importance, and it has to do with the construction of contracts. Here, the district court was presented with two competing motions for summary judgment. One by GSE, my client, claiming that the language of the contract, when read as a whole, was unambiguous. There was a second argument by GSE, which was that if for some reason the court found that the language was ambiguous, that is, the language was susceptible to two reasonable interpretations, that the only relevant evidence in the record supported the GSE position. That is, that a intellectual property fee would be due upon a large corporate transaction where the subject intellectual property merged. But that subject intellectual property was not the basis of the overall transaction. It is important to note that when you look at the entire document, that would be Attachment F to the consulting agreement, it sets forth both direct and indirect transactions. Sections 2, 3, and 4 of Attachment F spoke to direct transactions where there was a net acquisition. Is that really a fair characterization? It seemed to me that 2, 3, and 4 talked about circumstances where the sale, transfer, or merger of the IP was the primary reason for that transaction. Whereas Paragraph 6, which we are talking about, the transfer, merger, or sale of the IP was not the primary basis for it. So those are the two buckets that things are in rather than direct or indirect. Absolutely. Direct transactions involving the IP directly, and that would be under 2, 3, and 4. Sale, transfer, or license. No use of the word merge in 2, 3, and 4. And then in 6, it's an indirect transaction where it is sale, transfer, or merge. There's also another portion of 6. Well, again, I'm confused by what you're talking about with direct and indirect. I mean, the agreement, it seems to me, says in 2, 3, and 4 that the IP is the primary basis for what happens. Whereas in 6, it's not the primary basis, but in both instances, it's talking about the IP doing something. I apologize, Your Honor. I believe we're saying the same thing just in two different ways. Certainly, 2, 3, and 4 involve the intellectual property itself directly. It specifically says Harris sells its IP, Harris licenses its IP, or in the event that the IP is a primary basis of a third party's financial contribution, that's a business development. That's correct. So if Harris sold or licensed the IP, just the IP at issue in the case, there would be a net acquisition value. There was a way to measure how much money should be paid for the IP because that was all that was being sold, transferred, or licensed. But that's not the issue here. I mean, here the issue is whether or not everyone admits in their request for admission that what we're dealing with is that what transpired here, the reverse merger, the primary basis was not the intellectual property. That is correct. And so I'll move to that. I was performing or attempting to perform a compare and contrast. So when you get to Section 6, we need to know what type of transactions were involved there. And in Section 6, it is a transaction where the intellectual property is not the primary basis. So we know that whatever the transaction is, the intellectual property is simply included. It's not the reason for the transaction. And Section 6 involves larger corporate transactions. Where the district court erred is that it failed to look at all of the language of Section 6 and come up with a reasonable interpretation of the intent of the parties. It is significant. My colleague claims we have a fixation on it, but it is significant that market capitalization was used as the calculation of the intellectual property fee as opposed to net acquisition value. And that's because there was no way to determine the value of the IP in a larger corporate transaction. So the parties intended that it be a transaction where there was some impact on the market capitalization of a public entity. But I guess I'm still confused. In 2, 3, and 4, we're still talking about the IP doing something. And in 6, we're still there also talking about the IP doing something. I mean, it says in the event the IP is sold, merged, or transferred. And so I guess what I'm not seeing here is the IP having done anything. It stayed exactly where it was in the same subsidiary, and it didn't do anything. Thank you. Because the terminology used in 6, when you read all the language together, clearly refers to a larger corporate transaction. There is no common definition whatsoever of merging of intellectual property. It does not exist. It is obvious, we would argue, that when you look at the use of the terms market capitalization as the manner in which you calculate the fee, that can only relate to a public entity and an effect on the market capitalization of that transaction. And so that means that the merge language has to be a transaction, a corporate transaction. There's no such thing as merging IP. Well, how would that make sense, though, if that provision talks about the IP doing three things, potentially, it being sold, it being merged, or it being transferred? Yes. How would market capitalization have anything to do with the sale of a corporation or the transfer of a corporation? If Harris was sold, Harris Corporation was sold to Lockheed Martin, sold, the company. It would be sold to a public company. The market capitalization would be impacted, let there be no doubt. And the IP would go with that sale, and it's not the primary basis of that sale. In the same way, if Harris merges with another public company where there is an impact or a change in the market capitalization and the intellectual property is not the basis of that transaction, you have the same thing. We cannot read or leave out words when we're interpreting the agreement. And I think it's also important to consider what the word merge does not mean in the context of this document. In Section 2, 3, and 4, merge is not used. It's sale, transfer, license. In the other part of Section 6, we have business development, and then we also have the terms sale and transfer. Merge has to mean something. The parties intended it to mean something. And if we were talking about a large corporate transaction where there was a sale and the IP wasn't the reason for the sale and it resulted in a new market cap, then clearly if there's a transaction that is a merger and the IP isn't the primary basis of the transaction and there's a change in the market cap, then a fee should be paid. You see, if you take and you look at what the judge said— I would agree with you not that what you just said there was adding words to the agreement that are not there because the agreement says if the IP is sold, merged, or transferred and the primary basis of the sale, it doesn't include the primary basis of the merger, the primary basis of the transfer. I believe a reasonable interpretation of that additional language is just they used shorthand. It said sale, transfer, merge, and then it said on the primary basis of the sale. I believe they just dropped off those two words, and I absolutely believe that is a reasonable— But we don't add language to a contract. I'm not suggesting that you should. I'm not suggesting in any way that you should add any language to the contract. Rather, our argument is that we need to determine from the language used, all of the language used, what the parties intended. If you can't, or if a court believes there are two reasonable interpretations, or the court is not sure, this is ambiguous, then we turn to extrinsic evidence. In this case, what makes this somewhat different than most cases on contract interpretation is that all of the parties involved in the negotiation of that Exhibit F, Ken specifically, 6B1, all testified the same way. It was intended to cover a merger of the corporation. The lead negotiator for Harris testified to that effect. The program manager of Harris, a person actually named in the agreement itself and responsible for paying the invoices of GSE, testified that they meant a merger of the company. And just as importantly, that program manager, interestingly enough, was going to pay the $4 million invoice, but he didn't have the money in his budget. So it went elsewhere, and somebody else simply decided to not pay the invoice. The GSE president testified, just like the Harris employees, what was meant and why. It was a risk mitigation provision because George Taylor of GSE had been involved in mergers before, and he knew that core businesses survive, non-core businesses can be caught in a merger or a sale or a transfer. All of that testimony is undisputed. So if this court determines to reverse the lower court, which we certainly hope this court will do, this court should also remand and require the district court to enter summary judgment in favor of GSE, either because if this court finds that when you look at all of the language, including the market cap language, that it's unambiguous and in favor of our position, or there's no genuine issue of material fact. Thank you. Thank you, counsel. All right. We'll hear from Ms. Berard-Solis or Soles. Good morning, Your Honors, and may it please the court. Maureen Soles on behalf of Appellee L3 Harris Technologies, Inc. This is candidly a very simple breach of contract action. We have clear, unambiguous language that states in the event the IP is sold, merged, or transferred, and the primary basis of the sale is not the IP, then Harris Corporation has to pay a fee of 3% of market capitalization. And so what did the district court do here? He correctly asked the operative question, was the relevant IP sold, merged, or transferred? The court looked at the undisputed evidence and found there was no sale, merger, or transfer of the IP, and therefore correctly granted L3 Harris Technologies' motion for summary judgment. I can understand how IP can be sold. I can understand how IP can be transferred, but how can IP be merged? I think that if you apply the plain language of what merge means, it means that there's a combination. And so a party could come forward, and there could be some sort of joint business development, but in a formal entity setting. And so therefore, Harris Corporation, through its subsidiary that actually holds this IP, would contribute that and therefore merge it with another entity and put it into a separate entity to have a merger. There could also be, candidly, a merger where it didn't happen here, but where there is a merger of Eagle Technologies with another company. There, all the assets would be merged together with another entity, and that could trigger this provision. How do we deal, and I guess you would argue we don't get there, but given what your opponent argued, and it seems the evidence shows, that everyone associated with the transaction intended for the fee to be paid under these circumstances, how do we deal with that fact, or do you agree with that fact? I don't agree with that fact, Your Honor, because the circumstances here show that there was no sale or merger of the IP. I think that it is correct that the plain language of this contract, which is all that is relevant for the party's intent, that if there was some sort of, in the counterfactual world where L3Harris instead acquires, L3Harris Technologies acquires Harris Corporation, that that could implicate 6B1. But until you get there, until there is some corporate action that impacts the IP, that you would walk me through how this would apply, this particular provision. How 6B1 applies? In what scenario would it apply? So is it Corporation A has the IP, and it decides to merge with another corporation, and as part of the merger, they would then provide a particular IP, but the purchase of that IP or the merger of the IP is not the basis of the sale? Your Honor, I think that what my colleague was referencing, Lockheed Martin comes in, is interested in purchasing Harris Corporation, a straight acquisition purchase. That would implicate 6B1, because there would be a purchase of all the assets of Harris Corporation, which necessarily includes the below assets held in Eagle Technology LLC, which would then be a sale or merger of the IP itself, and so trigger 6B1. But until there is some sort of corporate action that impacts the IP, that provision is not implicated. And so here, because the plan of merger shows that we have over here a merger between L3 Technologies and mergers of a wholly owned subsidiary of Harris Corp., that that acquisition, the reverse triangle merger where L3 Technologies is a surviving company, that has no impact over here on the other subsidiaries of Harris Corporation, Harris International, which holds Eagle Technology, that holds the IP. So that's why the district court was correct here, that the undisputed evidence shows that the IP is no way implicated by this L3 Technologies reverse triangular merger. The day before the merger, the Harris Corporation held, Eagle Technology held the IP. The day after the merger, Eagle Technologies continued to hold the IP. There was no sale, merger, or transfer of that IP. Why is it not significant that the payment amount is based upon market capitalization? I mean, that seems to contemplate something beyond just the IP being combined. It seems to contemplate the corporate entities being combined. And so why is that not a significant factor in helping us understand what was intended with this provision? I think that my colleague in his reply brief actually concedes the point that the, because on page 11, ECF page 11, my colleague says that the triggering event is the sale merger of IP. And so if you don't have that event, the sale merger of the IP, you never get to the question of how do you calculate payment. And that is all that market capitalization would be relevant to, is the calculation of a payment after the triggering event happens. It's not the case that any time there is a corporate transaction within the Harris Corporation umbrella that this provision would be implicated because we have a definition of what IP is. It is the specific patents that were assigned to Harris Corporation. And until those, until that IP is sold, merged, or transferred, we don't have to answer any other questions about what market capitalization. And explain to me again how IP can be merged. I mean, I think you were talking about a situation where the IP was in a company, the holding company that was merged with another company, but I'm still wondering how IP itself gets merged. There was evidence from our expert that showed that you have a combination. You contribute the IP with another company's IP, and you further develop what that IP into new inventions. That would be one example. I think that... Why isn't that the example, why isn't that example covered by B3, utilizing the IP in some sort of business development? And if it is that, then merge must be something else, isn't it? I think 6B3 speaks that the primary basis would not be the IP and the primary basis for Eagle Technology to contribute or Harris Corporation to contribute. And so if the primary basis for Harris Corporation would be the contribution of the IP, then that would fall within that umbrella. The other example would just be a merger of the entities, and so therefore the assets, which would be the IP, would fall within that 6B1. I do think it's important, and the district court was correct here, that the merger in 2019 had no impact on who held the IP. The plan of merger, which is available at Docket Entry 55.9, makes it clear that the merger sub will be merged with and into L3 Technologies, and L3 Technologies is the surviving corporation and would be the wholly owned subsidiary of Harris. And I think that the merger does also speak to the IP. Article 5 of the plan of merger sets forth mutual representations and warranties of both parties. This is at page 50 of Docket Entry 55.9, and it says at 5.15c, each party and its subsidiaries own or have sufficient rights to use all intellectual property used in or necessary for the operation of their respective businesses as presently conducted, and all of such rights will survive unchanged after the consummation of the transactions. The plan of merger makes entirely clear that this plan of merger has no impact on the IP that is relevant here. Do you agree, and I've asked this question poorly before, but as I thought I understood the evidence, and I know your argument is we don't get to parole evidence because the language is clear, but I thought the undisputed parole evidence was that the whole point of this provision was to protect the appellant from what happened here, which was the change in corporate structure somewhere in the chain that ultimately led to this component of the business being abandoned. Do you agree that that's what the undisputed evidence shows? I do believe that there is testimony, undisputed testimony of GSC's desire to have some sort of protection against that. There is testimony to that effect. However, I would submit to the Court that this would be the most inartful way to accomplish that, and there is nothing in the contract that accomplishes what his intent would be, because it's undisputed as well, Mr. Taylor, as the corporate representative of GSC testified, that he acknowledged that at any time the parties could stop, or Harris Corporation could stop using this IP and have no financial obligation to him. That is just a business decision that was always present. There was no continuing obligation to continue to make the work share payment or to continue to use the consultant fees. And so it would be a strange argument to say that although that right remained with Harris Corporation, that there would be a separate and inartfully drafted way to make a mandatory payment for any type of corporate transaction. Well, I guess it would make sense in some respects if you enter into an agreement with Company A and you trust that relationship, but you don't trust the relationship or you don't know what the relationship is going to be between Company B that comes in and merges or acquires Company A, it seems to make complete sense. You'll trust Company A, Harris, to keep the business going, but you're concerned that Company B comes in and shuts it down, and that's what this was intended to protect against. And it seems like everybody agreed that's what this was intended to protect against. I agree with you. What an artful way to do it. And so on that point, do we construe this language against one party or the other? No, Your Honor. I think there's a full integration clause in the consultant agreement. Both parties agreed that they were represented by counsel, and so there is no reason to interpret a contract against one party or the other, the drafter or the other. But to your point, Your Honor, about that you trust Party A but Party B, you would still want some sort of protection in that sense because there is no dispute that Harris Corporation, you know, months before this merger was being negotiated for, I believe, close to a year, they could have stopped using this at any time. There would be no obligation to make any type of payment in the counterfactual world where there was a merger or sale of the IP, which is not present here. But I think it is important that because the language here is entirely clear and unambiguous, we never get to that question of parole evidence. There is nothing. The only way that counsel makes that argument is by reading words into the contract that are nowhere present within the agreement. Now, appellants do make pay of the fact that we are focused on the form of a first triangular merger to emphasize that there was no sale, merger, or transfer of the IP. Candidly, I am not sure where that comes from. This is a respective form of a corporate transaction. Parties use it all the time. And it would be a great upheaval if courts tried to ignore the corporate form in this way and read it as appellants suggest. In that form of merger or that transaction, that transaction used to accomplish, practically speaking, what actually happened here, where Harris and L3 merged as two separate companies. They just did it through this corporate machination to accomplish what was more financially advantaged, tax advantaged, or whatever reason they did it. But this is a Harris-L3 merger. I mean, that is what happened here, right? Your Honor, Harris Corporation was able to place L3 Technologies as a subsidiary of it. And it is used as a first triangular merger because it accomplishes important things for companies. It's a simpler process than a direct merger. It allows the target company to continue to exist without interfering with contracts, without interfering with any assignment obligations. So it is important. Now, there was a change of name after the merger came into effect and L3 Technologies was placed as a subsidiary of Harris Corporation. But that name change has no legal impact on the IP that's held within Eagle Technologies. The name change doesn't make any change in control. If there are no further questions, we would ask the Court to affirm the judgment below as the District Court properly granted summary judgment for L3 Harris Technologies. Thank you, Your Honor. Thank you, Ms. Soles. Mr. Stobash, you have five minutes. Your Honors, thank you. A couple of points of interest. Sorry, four minutes. Thank you. It appears that perhaps L3 Harris inadvertently conceded our position. They make our argument for us when they concede that a sale of Harris to Lockheed Martin would cause the intellectual property fee to be paid. They simply refuse to concede that a merger without Lockheed Martin would cause the intellectual property fee to be paid. That is, that's impossible. I think the distinction, and I'm not sure that concession is necessarily proper or made, but the distinction seems to be when you sell, if the entire Harris Corporation and all its subsidiaries were sold to Lockheed Martin or anyone else, then there is a transfer of everything that is within the Harris umbrella, whereas the merger, it seems like the way it was structured, that IP, which was in one basket, never moved from that basket. So it seems like there's a difference. I understand your point, and I tend to agree with you that what happened here was L3 and Harris merged. That's what happened from the market's perspective. But when you look at the actual paperwork, that's not what happened. All right, so two responses. First of all, the argument of L3-Harris suggests that the IP, which is in a file cabinet, it's a piece of paper that talks about what the intellectual properties needs to move to another file cabinet for this to apply. That cannot be the case. If Harris was sold to Lockheed Martin, Harris is still going to be on the east coast of Florida. The intellectual property is going to be there. The subsidiaries are going to be there. Exactly the same in a merger. I don't believe that there is a difference in that particular regard. And transfer is a separate and independent term in the document. With respect now to the reverse triangular merger, the case law cited, while not on point and not necessarily relevant to our case, at least educates us as to why companies use reverse triangular mergers. And that's because the companies want the assets of the target company to remain there for liability purposes, so that the acquiring company in the merger doesn't take on that liability. So what happens here? We have Harris. They redeemed the acquire. L3 was the target. Well, this agreement, this consulting agreement, is with Harris. It has nothing to do with the target. So all of that reverse triangular merger theory has no import, has no role in the decision here. Perhaps it would if we were talking about a consulting agreement with L3. But we're talking about the consulting agreement with Harris. But both parties were represented by counsel here. Correct. So what difference does it make if ‑‑ I'm just assuming your premise for purposes of this question. What difference does it make if, in one scenario, the outcome under the contract is that the IP has been transferred and a payment should be made, and in the other it isn't? I mean, if both parties are represented by counsel in entering into this and that's how they decided they wanted to structure the transaction, what business do we have going in and fixing any kinds of unforeseen mistakes that might have been made by one of the parties? Fair. I do not believe that this Court using proper contract construction and construing the intent of the parties as meaning the fee is due is adding anything, fixing anything, changing anything. It is clear that the language could have been drafted better, but that is not the issue. The issue is based upon the language, which clearly includes a requirement that market capitalization be construed here. And you simply are trying to determine the intent 12 years after this agreement was written. We're not fixing it. We're just construing it. I thank you for your time. We respectfully request that the Court reverse the summary judgment entered and remand and ask that summary judgment be entered in our favor, either because you are able to reasonably construe all of the language or it's because you looked at the extrinsic evidence of which there is no genuine issue of material fact. Thank you. Thank you, Counsel. Thank you.